DOWD, J.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| Anthony Wheeler, | ) | |
| | ) | CASE NO. 1:08 CV 1117 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MEMORANDUM  OPINION  AND |
| | ) | ORDER |
| City of Cleveland, Ohio, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## I.  INTRODUCTION

This case, brought pursuant to 42 U.S.C. § 1983, contends that the plaintiff, Anthony

Wheeler, (hereinafter "Wheeler") was the victim of an unlawful warrantless arrest on the

morning of April 2, 2008 by two Cleveland police officers, Danny Ellis and Christopher Lane,

and in the process, was subjected to an excessive force beating causing him injuries.

Thereafter, Wheeler was transported to the Cleveland Police Department and eventually

transported to the Huron Hospital to attend to his alleged injuries.  Officers Ellis and Lane did

not file a complaint or issue a citation to Wheeler.[1]  No other person appeared to file a complaint

against Wheeler and he was eventually released from the control of the Cleveland Police

---

[1]Rule 4(E)( 2) of the Ohio Rules of Criminal Procedure provides:

> (2)  Arrest without warrant.  Where a person is arrested without a
> warrant the arresting officer shall, ... bring the arrested person
> without unnecessary delay before a court having jurisdiction of the
> offense, and shall file or cause to be filed a complaint describing
> the offense for which the person was arrested.  Thereafter, the
> court shall proceed in accordance with Crim. R. 5.

(1:08 CV 1117)

Department approximately 35 hours later without any charges ever being filed.

Against that background, counsel for the plaintiff have filed a complaint containing eight counts as follows:

Count I, pursuant to Section 1983, alleges excessive force against the plaintiff without a warrant or cause for arrest.

Count II, also under Section 1983, restates the excessive force allegation and contends that it shocks the conscience.

Count III, also pursuant to Section 1983, alleges excessive, unreasonable and injurious force in arresting and detaining the plaintiff and the subsequent denial of medical treatment.

Count IV, constitutes a *Monell* claim against the City of Cleveland based on the unlawful and unreasonable detention of the plaintiff by the Cleveland Police Department without any criminal charges being filed against the plaintiff before being released from police custody, and also appears to join a *Monell* claim against the City of Cleveland on several bases, i.e.,

--- inadequately training police officers concerning police procedures and Constitutional limitations relative to the use of force;

--- a custom or policy of failing to discipline officers who engage in the improper use of force;

which policy and/or custom of inadequately hiring, training, supervising and disciplining its police officers caused Ellis and Lane to engage in excessive force against the plaintiff.

Count V is a *Monell* claim under Section 1983 related to the unreasonable detention of the plaintiff;

2

(1:08 CV 1117)

Count VI is a pendent state action for assault.

Count VII is a state pendent action under O.R.C. Section 2744.03(A)(6).[2]

Count VIII is a state pendent action for intentional infliction of emotional distress.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  When considering a motion for summary judgment, "the inferences to be drawn from the underlying facts contained in [affidavits, pleadings, depositions, answers to interrogatories, and admissions] must be viewed in the light most favorable to the party opposing the motion."  *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).  However, the adverse party "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 256 (1986).

The Rule requires the nonmoving party who has the burden of proof at trial to oppose a proper summary judgment motion "by any of the kinds of evidentiary material listed in Rule 56(c), except the mere pleadings themselves[.]"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  General averments or conclusory allegations of an affidavit do not create specific fact disputes for summary judgment purposes.  *See Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).  Nor may a party "create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts . . . earlier deposition testimony."  *Reid*

---

[2]Section 2744.03 identifies defenses or immunities of a subdivision and employee and a copy of the text is attached as Appendix I.

3

(1:08 CV 1117)

*v. Sears Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986) (citing *Biechell v. Cedar Point, Inc.*, 747 F.2d 209, 215 (6th Cir. 1984)); *but see Baer v. Chase*, 392 F.3d 609, 623-26 (3d Cir. 2004) (noting that a so-called "sham" affidavit need not be disregarded if there is "independent evidence in the record to bolster [the] otherwise questionable affidavit").  Further, "'[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'" *Street v. J.C.* , 886 F.2d 1472, 1477 (6th Cir. 1989) (quoting *Anderson v. Liberty Lobby*, 477 U.S. at 252).

In sum, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," 477 U.S. at 250.  Put another way, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id*. at 251-52.  *See also Wexler v. White's Fine Furniture, Inc*., 317 F.3d 564, 578 (6th Cir. 2003) ("[t]he conflicting proof and the inferences that can be drawn therefrom raise genuine issues of material fact that preclude the grant of summary judgment").

### III.  THE COURT'S ANALYSIS

A.    <u>Counts I and II (Warrantless Arrest and Excessive Force Claims)</u>

The first issue in this case is whether defendant Officer Lane had probable cause to make the warrantless arrest of Wheeler.[3]  The second issue is whether the plaintiff Wheeler was

---

[3]It is beyond dispute that Wheeler was arrested without a warrant by Officer Lane.

4

(1:08 CV 1117)

subjected to excessive force.  A third issue, assuming the Court finds a lack of probable cause for

the warrantless arrest of Wheeler by defendant Officer Lane, is whether Officer Lane is entitled

to a dismissal of Count I based on qualified immunity with respect to the fact of the warrantless

arrest.[4]  The fourth issue is whether defendants Officer Lane and Officer Ellis are entitled to

dismissal based on qualified immunity with respect to the use of excessive force.

1.      <u>Selected Portions of Officer Lane's Deposition Testimony on the Issue of Probable Cause
to Justify the Warrantless Arrest and the Issue of Excessive Force</u>

> Q.      What did you or Officer Ellis do next?
>
> A.      Officer Ellis stayed with Lachole Oliver and issued her a
> citation for disorderly conduct, and as he was doing that I went
> through the back yards to where the males fled trying to locate
> them.
>
> Q.      And what facts did you possess that the males who fled had
> engaged in criminal activity at that time?
>
> A.      No facts other than the disorderly conduct.[5]
>
> Q.      That happened next?
>
> A.      As he was finishing up the citation I observed the males
> that fled earlier on East 103rd through a field.
>
> Q.      And these are the males that you were attempting to run
> after?
>
> A.      Correct.

---

[4]The Court is of the view that a determination that Officer Lane lacked probable cause to
make the warrantless arrest of Wheeler does not foreclose a subsequent inquiry as to
whether Officer Lane is entitled to qualified immunity with respect to the fact of the
arrest.

[5]*See* Doc. No. 29, page 52, line 8-14.

5

(1:08 CV 1117)

Q.      And where did you observe them?

A.      They were on East 103rd where the car was.  There was an open field and you can see over top East 103rd, and I saw them walking southbound on East 103rd towards Quebec Avenue.

Q.      There is still about approximately four males at this time?

A.      Correct.

Q.      What did you do?

A.      At the time I went into the back yard towards East 103rd.

Q.      Was that on foot?

A.      On foot, correct.

Q.      And where was officer Ellis?

A.      He was at the car.

Q.      Was he completed with issuing the citation to Lachole Oliver at that time?

A.      Yes.

Q.      And what happened next?

A.      As I was going through the back yard.  I made it over to East 103rd is when I was in the back yard, I observed the four males standing in front of Miss Anderson's apartment calling her, yelling at her, <u>"Why did you call the police?  Stop snitching or we are going to shoot your house up."  And words to that extent. They were back threatening her again.</u>  (Emphasis added.)

Q.      They were in front of her house?

A.      Yes, correct.  Her apartment.

Q.      Were all of the males making these statements or one particular male making the statements?

(1:08 CV 1117)

A.    Sounded like all of them were making statements.

Q.    And again it was dark out?

A.    Correct.

Q.    Could you see any of the faces of the individuals?

A.    Not from my vantage point, but I could see the individuals in front of the apartment making threats.

Q.    About how far were you away at this point in time?

A.    Couldn't have been no more than 50, 75 feet from where they were at.

Q.    And about how long did that conduct last?

A.    It went on for a couple minutes, and as I was observing them making the threats the assignment come over the radio from dispatch that males were threatening on East 103rd and that is when I advised radio we would handle the incident because we were right there.  (Emphasis added.)

Q.    And you could hear that on the radio you had on your person at the time?

A.    Correct.

Q.    Did you believe these to be the same males that Miss Anderson had alleged were threatening her earlier in the evening (Emphasis added.)

A.    Yes. (Emphasis added.)

Q.    What did you do next?

A.    At this time I radioed Officer Ellis to drive the zone car from up on Quebec Avenue Northern [sic] on to East 103rd.  As he turned the corner to go north on East 103rd the males fled northbound and then they fled in several different directions and I was standing in between two houses observing where they were

7

(1:08 CV 1117)

running.

Q.      Do you know the addresses or whereabouts of the homes that were standing in between?

A.      No.

Q.      That was on East 103rd?

A.      Correct.

Q.      And what did you do next?

A.      Officer Ellis came around the corner, the males start fleeing, like I said, in all different directions.  At this time Mr. Wheeler ran in between houses where I was standing so as he turned the corner to come between the houses I was standing right there and he went to go turn to run back westbound to flee from me.  As he did so, I don't know if he tripped on his own foot or the sidewalk was uneven on the house, and he fell down to the ground dropping his cell phone.  He had his cell phone in his hand, when he turned to run he tripped over the sidewalk and dropped his cell phone.  (Emphasis added.)

Q.      Where was officer Ellis at this time?

A.      He was in the car coming down the street.

Q.      Did you have any communications with Officer Ellis over the radio that you had on your person?

A.      No.

Q.      Did you have any communications with a sergeant or lieutenant via the radio you had on your person?

A.      No.

Q.      And then what happened?

A.      As he turned and ran and fell he was on his back and I attempted to get him on his stomach so I could place him in

8

(1:08 CV 1117)

> handcuffs, and I managed to get him over to his stomach, and as I
> did I placed my knee in the small of his back and placed him in the
> handcuffs. (Emphasis added.)

Q.     Was Anthony Wheeler by himself at this time?

A.     Yes.

Q.     Did you make any inquiry of Anthony Wheeler?

A.     As far as?

Q.     Did you question him regarding anything?  (Emphasis added.)

A.     I can't remember.  (Emphasis added.)

Q.     Did you have your firearm drawn at this time?

A.     No.

Q.     Did you have a warrant for Anthony Wheeler's arrest? (Emphasis added.)

A.     No.

Q.     What facts did you possess to suspect Anthony Wheeler of criminal activity? (Emphasis added.)

A.     I observed him in the group of males menacing a victim, a crime victim.  (Emphasis added.)

Q.     Is that Miss Anderson?

A.     Correct.

Q.     And you said at the time you observed these individuals you were about 50 to 75 feet away, correct?

A.     Correct.

Q.     And it was dark out so you could not see their faces, is that

9

(1:08 CV 1117)

correct?

A.      Correct.

Q.      <u>And you don't know specifically if one or all four of those individuals were issuing threats to Miss Anderson, is that correct?</u> (Emphasis added.)

A.      <u>I can't recall if one or all of them were.</u> (Emphasis added.)

Q.      You said you attempted to get Anthony Wheeler on his stomach after you observed he fell on his back.

A.      Correct.

Q.      How did you go about doing that?

A.      I just basically grabbed him and rolled him over on his stomach so I could get the cuffs on him.

Q.      Did you ask Anthony Wheeler to roll over on to his stomach?

A.      I don't recall.

Q.      So you used physical force in order to roll Anthony Wheeler over on to his stomach?

A.      Correct.

Q.      And was his face facing the ground at this time?

A.      After I rolled him over on his stomach, yes.

Q.      Did you ever have to order Anthony Wheeler to get on the ground, or you simply turned him over on his back?

A.      Once he fell I turned him over.

Q.      After you turned Anthony over you said you placed your knee on the small of his back.

10

(1:08 CV 1117)

A.      Correct.

Q.      Did you exert any other physical force to pin Anthony Wheeler down to the ground?

A.      Just my knee to bring the hands back in compliance to get the cuffs off.

Q.      Did you have to physically pull Anthony Wheeler's hands back to put the handcuffs on?

A.      I can't remember.

Q.      Were you the only one present when you put the handcuffs on Anthony Wheeler?

A.      Yes.[6]

Q.      Did you ever punch or strike Anthony Wheeler in the face, head, or any other part of his body?

A.      No.

Q.      Did you ever hit Anthony on the side, back, groin, or any other point on his body?

A.      When I placed my knee on the small of his back that is the only time.

Q.      When did Officer Ellis arrive?

A.      After I had Mr. Wheeler handcuffed Officer Ellis came down to my location and he assisted me in picking up Mr. Wheeler off the ground.

Q.      When officer Ellis arrived on the scene did you ever observe officer Ellis kick Anthony Wheeler on the side, ribs, or any other part of his body?

_____

[6]*See* Doc. No. 29, page 56, line 9 through page 62, line 18.

11

(1:08 CV 1117)

A.      No.

Q.      Did Officer Ellis ever physically pin Anthony down to restrain his movement?

A.      No.[7]

2.      <u>Selected Portions of Anthony Wheeler's Deposition Supporting the Proposition that He was Subjected to Excessive Force</u>[8]

Q.      Okay.  So as you were on the sidewalk talking to Sharrie, the tall officer just said put your hands up --

A.      He said --

Q.      -- or he said freeze?

A.      -- freeze.

Q.      and then what did you do?

A.      I had put my hands up -- and I had freeze and then I put my hands up and dropped my phone.

Q.      Did you ever get your phone back?

A.      They gave it to my grandmother when she came around.

Q.      The officers gave to it him or who picked up your phone?

A.      The officer gave it to my grandma.

Q.      Okay.  When you put your hands up, what did the tall officer do?

A.      He told me to get on the ground.

Q.      Okay.

---

[7]*See* Docket No. 29, page 63, lines 6-23.

[8]*See* Docket No. 19-03, line 24 through page 50, line 15.

(1:08 CV 1117)

> A.    So I got on the ground.

> Q.    You got on your knees or you lay on the ground?

> A.    On my knees.  I was in the grass, so I got on my knees, and then I went down and put my hands in the grass.

> Q.    So you first got on your knees and then you put your hands down on the ground?

> A.    Yes.

> Q.    And then what?

> A.    <u>And that's when he put his knee in my back and he hit me across the head with something.  And that's when he started hitting me upside my ribs, he kneed me in the private part.  And I'd say like a minute or two went by -- well, I'd say a minute.  And then that's when his partner had came [sic] down the street.  And his partner got out of the car.  He was like, here, we got you.  Then he kicked me on the side of my rib.  And then they put me in handcuffs.  And he lifted me up a little bit and dragged me.  And I had messed up my face and my shoulder.</u>[9]  (Emphasis added.)

> Q.    Who cuffed you?

> A.    The tall one.

> Q.    While you were laying on the ground?

> A.    Yes.

> Q.    And then did both of the officers pick you up?

---

[9]The opposition filed by the plaintiff to defendants' motion for summary judgment include affidavits by Lachole Oliver (Doc. No. 25-3), the affidavit of Jonathan Holt (Docket No. 25-6), the affidavit of Berdeen McMullins (Doc. No. 25-5) and the affidavit of Sam McDowell, Jr. (Doc. No. 25-4) which support the testimony of the plaintiff Wheeler that he was subjected to excessive force during the arresting process conducted by Officers Lane and Ellis.

(1:08 CV 1117)

A.     One of them had picked me up.  And then when he had saw me getting dragged he had came over there, the short one came over there, and helped me.

Q.     So they dragged you to the zone car?

A.     No, they aint' drag me to the zone car.  They drag me, the tall one had --

Q.     To get up?

A.     No.  I don't know whether it was trying to get up or not. He had dragged me, he lift me up halfway and then went forward. And that's when I messed up my shoulder and my face right here.

Q.     Oh, you're saying he was picking you up off the ground.

A.     Yes.

Q.     What you are saying happened to your shoulder and your face?

A.     I had got dragged on the concrete.

Q.     So it was a scrape on your shoulder?

A.     Yes.

Q.     And a scrape on your face?

A.     Yes.

14

(1:08 CV 1117)

3.  <u>Relevant Portions of the Deposition Testimony of Defendant Officer Ellis Clearly</u>
    <u>Indicate that the Decision to "Arrest" Wheeler for Aggravated Menacing Came After the</u>
    <u>Warrantless Arrest by Officer Lane</u>[10]

> Q.      I'll rephrase.  After Anthony Wheeler was put in the zone
> car what happened?
>
> A.      Office Lane went and talked to Miss Anderson, Miss
> Anderson <u>signed a misdemeanor complaint and statement stating</u>
> <u>that Anthony Wheeler was threatening her or menacing</u>.  <u>We then</u>
> <u>arrested him for the menacing</u>.  We advised her to go to the
> prosecutor.  Anthony's grandmother came and talked to us.
> (Emphasis added.)
>
> Q.      Did you transport Anthony Wheeler in the zone car to Erica
> Anderson's home?
>
> A.      No.  The zone car was parked, if I had to guess, 50 feet
> from her house, her house and an open field.  I parked in front of
> the open field.  Maybe less.
>
> Q.      Did Officer Lane travel on foot to go speak the [sic] Erica
> Anderson?
>
> A.      Yes.
>
> Q.      And you stated that Anthony's grandmother was present.
> When did she arrive?
>
> A.      Some time after he was in the car and before we left.
>
> Q.      Did you have any conversations with Anthony Wheeler's
> grandmother?
>
> A.      Yes.
>
> Q.      What were those conversations?

--------

[10]*See* Doc. No. 28, page 62, line 18 through page 65, line 15.

15

(1:08 CV 1117)

A.      I don't recall everything.  She asked us why he was arrested and we explained to her.  She explained to us that he had a learning disability of some sort.  I don't remember the exact words she used.  We advised her that he would be able to call family after he was booked into the District.

Q.      You stated, I believe, that Officer Lane wanted to speak with Miss Anderson.  Do you know what the topic of their conversation was?

A.      No.

Q.      Did Officer Lane go to speak with Miss Anderson at her house?

A.      Yes.

Q.      Did she live on a second floor at 2299 East 103rd Street?

A.      I'm not sure.  Both times we talked to her she was outside in her front yard.  I never went to her apartment.

Q.      Were you present when Officer Lane spoke with Miss Anderson? (Emphasis added.)

A.      The second time? (Emphasis added.)

Q.      The second time, yes.  (Emphasis added.)

A.      Not directly right there, no.  I was at the zone car with Anthony Wheeler. (Emphasis added.)

Q.      Do you know what Officer Lane told Miss Anderson? (Emphasis added.)

A.      No.  Not word for word, no. (Emphasis added.)

Q.      Did Miss Anderson ever come down to the zone car to identify Anthony Wheeler as one of the individuals who were [sic] threatening her or her daughter?

A.      She did not come to the zone car, but as we were taking

16

(1:08 CV 1117)

> him back to the zone car she stated that's one of them. (Emphasis
> added.)
>
> Q.      As you were taking -- (Emphasis added.)
>
> A.      -- As were taking Anthony to the zone car she stated that's
> one of them, or that's him, or something to that effect, yes.
> (Emphasis added.)
>
> Q.      Where was Miss Anderson in relation to the zone car at that
> point in time?
>
> A.      She was near her front porch, so approximately if I had to
> guess 25 feet, I think I said.
>
> Q.      I believe you testified 50 feet.
>
> A.      50 feet, 25 feet.  I was parked next to the field next to her
> house.
>
> Q.      And did Miss Anderson sign a written statement to the
> effect that Anthony Wheeler was one of the individuals threatening
> her or her daughter on April 2, 2007?  (Emphasis added.)
>
> A.      Yes.

4.      The Court's Rulings

   a.      Warrantless Arrest

*Beck v. Ohio*, 379 U.S. 89, 91 (1964) set the standard for the determination of whether an

officer arresting without a warrant had probable cause for the warrantless arrest and describing

the standard as: "at the moment [of the arrest], the facts and circumstances within [his]

knowledge and of which [he] had reasonably trusty information, were sufficient to warrant a

prudent man in believing that the [arrestee] had committed or was committing an offense."

      After examining the deposition testimony of Wheeler, Ellis and Lane, the Court finds that

17

(1:08 CV 1117)

issues of material fact exist as to whether Officer Lane had probable cause to make the

warrantless arrest of Wheeler at the time of his arrest and physical take-down.[11]

The Court notes that the defendants Ellis and Lane contend that Erica Anderson, the

mother of the daughter subjected to threats of physical harm, identified Wheeler as being in the

group that was continuing to engage in verbal conduct, contended to be threatening and

constituting the alleged aggravated menacing.

While is it not dispositive, no party apparently attempted to depose Erica Anderson.

However, her affidavit was submitted by plaintiff's counsel in support of his opposition to the

motion for summary judgment and in her affidavit, she stated:

> "My name is Erica Anderson.  I live at 2299 E. 103rd Street, Apt.
> #2, Cleveland, Ohio 44106.  I make the following statement
> voluntarily.
>
> "I do not recall the exact date, but in the spring or summer of 2007,
> in the evening, my daughter came home from the store and stated
> that a boy named "Raymond" threatened her with a gun.  I called
> the police.  Approximately three or four police cars arrived about
> ten to fifteen minutes later.  I went down to the front of the house
> when the police arrived and spoke to a police officer and his
> partner.  My daughter gave the police officers a description of
> Raymond, including what he was wearing and what he looked like.

---

[11]The reply memorandum in support of the motion for summary judgment filed by all
defendants (Doc. No. 35) recites in favor of a finding of probable cause the fact that
Anderson came to the zone car and personally identified Wheeler as "one of them," i.e.
one of the males who was threatening her and signed a misdemeanor complaint form
saying the same.  Apparently, the defendants are of the view that this information after
the warrantless arrest by Officer Lane arrest justifies that arrest.  No authority is cited for
such a proposition and this Court knows of no such proposition.  However, to belabor the
obvious, armed with the alleged accusation of Erica Anderson, the stage was set for
either Lane or Ellis to sign a complaint charging Wheeler with the crimes of aggravated
menacing.  However, no such action was taken.

(1:08 CV 1117)

> My daughter and I then went back into our apartment, and I
> walked out onto the top porch.
>
> "I saw the police officers in the area looking for Raymond.  Then, I
> saw some boys run by and the police officers chased them.  I saw
> the person that I now know to be Anthony Wheeler walking on the
> sidewalk on East 103rd Street, on the same side of the street and to
> the right of my apartment.  A police car then drove up to block
> Anthony's path.  I then went into my apartment for a minute.
>
> "A police officer then knocked on my door.  The officer advised
> me that they thought they had found Raymond.  The police officer
> asked me to come down to the police car.
>
> "I went down to the police car.  There were two police officers and
> they asked if the person in the back seat of the police car was the
> person threatening my daughter.  I recognized the person in the
> police car as someone who lived in my neighborhood, and not
> Raymond.  I told the police officers that the person in the police
> car was not Raymond.
>
> "I then went back into my apartment and the police officers left.
> Anthony Wheeler was not the person who had threatened my
> daughter.
>
> "All of the above statements are true to the best of my knowledge,
> information and belief."[12]

In conclusion, the Court finds that there are material facts in dispute on the issue of

whether Officer Lane had probable cause to arrest Wheeler at the time of the warrantless arrest.

However, this determination does not stop the Court's inquiry with respect as to whether

defendant Officer Lane is entitled to qualified immunity with respect to the warrantless arrest of

the plaintiff.

---

[12]The Erica Anderson affidavit leaves unresolved the factual issue of whether Wheeler
was in the group described as engaging in threats immediately before the take-down of
Wheeler by Officer Lane.

19

(1:08 CV 1117)

The deposition testimony of defendant police Officers Ellis and Lane indicates clearly that only Officer Lane was the moving force in the warrantless arrest of Wheeler.  As defendant Officer Ellis did not initiate or participate in the warrantless arrest of the plaintiff, he is entitled to summary judgment on Count I with respect to the warrantless arrest.

     b.     <u>Qualified Immunity as to Warrantless Arrest</u>

After the Court conducted oral argument on the pending motions, the Court requested that a number of items be filed with the Court: 1) a copy of the misdemeanor complaint allegedly executed by Erica Anderson; 2) any written reports filed by Officers Lane and Ellis following the warrantless arrest of Wheeler; and 3) a verbatim transcript of the three 911 calls made to the Cleveland dispatch center on April 2, 2007 by Erica Anderson.  Counsel for the defendants has filed the same.  *See* Docket No. 47.  The five-page transcript of the three calls is attached hereto as Appendix II.

The decision of *Hunter v. Bryant*, 502 U.S. 224 (1991) announces the proposition that qualified immunity shields arresting law enforcement agents from suit for damages if "a reasonable officer could have believed [*Bryant*'s arrest] to be lawful, in light of clearly established law and information the [arresting] officers possessed," citing *Anderson v. Creighton,* 483 U.S. 635, 641 (1987), which declared that law enforcement officials who "reasonably but mistakenly conclude that probable cause is present" are entitled to immunity.

As a consequence, the Court's focus is now directed to the proposition of whether the facts in this case are such that Officer Lane could have reasonably believed that probable cause existed to make Wheeler's warrantless arrest.  In that context, the Court notes that Erica

20

(1:08 CV 1117)

Anderson had repeatedly sought law enforcement protection for her daughter over a protracted period of time on the evening of April 2, 2007, as reflected in Appendix II; that Officer Lane observed a group of young males late in the evening engaged in abusive language toward Erica Anderson, and that subsequently, Officer Lane, in an apparent attempt to bring the harassment of Erica Anderson and her daughter to a conclusion, chased and arrested Wheeler.

The Court finds, after considering the above-described facts and circumstances in the context of the totality of the circumstances and the teachings of *Hunter v. Bryant* and *Anderson v. Creighton*, that the defendant Officer Lane is protected by the qualified immunity shield.  As a consequence, the plaintiff's unlawful arrest cause of action as set forth in Count I is dismissed as to the defendant Officer Lane.

      c.     <u>Excessive Force</u>

There remains the fact issue of whether Officers Ellis and Lane subjected Wheeler to excessive force in connection with his warrantless arrest.  The Court determines that there are material facts in dispute with respect to the question of whether defendants Officers Lane and Ellis subjected the plaintiff to excessive force in connection with his physical arrest.

Even though the Court has determined that Officer Lane is protected by the qualified immunity shield with respect to the warrantless arrest, that shield does not protect either defendants Officers Lane or Ellis against the claim that they engaged in excessive force in connection with Wheeler's arrest.  It is well established that law enforcement officers cannot engage in excessive force in an arrest situation under the facts set forth in this case and viewed in the light most favorable to the plaintiff.  No claim is made that in any way, shape or form that

21

(1:08 CV 1117)

Wheeler attempted to resist the arresting process.  To the contrary, Wheeler was compliant, as indicated by the deposition testimony of defendant Officers Lane and Ellis.  Consequently, the extent of the physical force applied to Wheeler by the defendant Officers Lane and Ellis, and as corroborated by the affidavits by the bystanders, requires a rejection of the claim of qualified immunity on behalf of defendant Officers Ellis and Lane.

Accordingly, the motion of defendant Officers Ellis and Lane for summary judgment with respect to Counts I and II as to the use of excessive force in connection with Wheeler's warrantless arrest is without merit as there are material facts in dispute.  Further, the motion of defendants Officers Ellis and Lane to dismiss Counts I and  II as to the use of force on the basis of qualified immunity is denied.

B.    Count III (Denial of Medical Treatment Claim)

Summary judgment is granted as to Count III to the extent it alleges that defendant Officers Lane and Ellis denied Wheeler medical treatment.  After viewing the facts in the light most favorable to the plaintiff,[13] the evidence presented in support of the denial of medical treatment fails to require a denial of the motion for summary judgment advanced by

---

[13]There is no indication that Wheeler requested medical treatment.  Furthermore, Wheeler admitted that Office Lane "went to get something and wiped my face."  Furthermore, on the morning of April 3, Wheeler was taken to the Huron Road Hospital and treated for minor scrapes and bruises and then released back into the custody of the City of Cleveland.  After his release from custody, Wheeler's mother took him to the St. Vincent Charity Hospital on the evening of April 4, where he was treated for abrasions on his cheek and shoulder and a bruise on his lower back.  Under the foregoing circumstances, the Court finds that the claim for denial of medical treatment has not been supported by the plaintiff.

22

(1:08 CV 1117)

defendants.[14]

C.      Count IV and V (The *Monell* Claims Including the Unlawful Detention Claim)

        1.      Count IV

        The plaintiff advances a series of *Monell* claims including an inadequate training claim

and a failure to discipline officers who engage in the improper use of force, i.e., Officers Lane

and Ellis.  After reviewing the considerable testimony submitted collectively by counsel, the

Court finds that the evidence viewed in the light most favorable to the plaintiff requires a

rejection of the *Monell* claims with respect to the inadequate training claim and a claim of a

policy or custom failing to supervise and discipline defendant police Officers Ellis and Lane.

Accordingly, defendants' motion for summary judgment as to Count IV is granted.

        2.      Count V

        With respect to plaintiff's unlawful detention claim, the Court finds that the City of

Cleveland's detention of the plaintiff in this case supports a *Monell* claim.

        The City defends the detention as permissible under the 48 hour rule announced in the

case of *County of Riverside v. McLaughlin*, 500 U.S. 44 (1991), and cites *Doe v. City of*

*Cleveland,* 788 F. Supp 979 (N.D. Ohio 1991) in support of its motion for summary judgment.

In *Doe*, the plaintiff  was arrested by City of Cleveland police officers without a warrant based

_____

[14]The balance of Count III alleges excessive, unreasonable and injurious force in
arresting and detaining the plaintiff.  Counts I and II brought under the provisions of
§1983, restates the excessive force allegation set forth in Count II.  In sum, Counts I, II
and III allege that the plaintiff was subjected to excessive force in connection with the
warrantless arrest.  In the Court's view, the plaintiff is entitled to go to the jury on the
claim of the excessive force, but the Court sees no reason to submit the claim of
excessive force on more than one basis.

23

(1:08 CV 1117)

on a statement from a victim that Doe had stabbed him.  The victim ultimately recanted his

accusation against plaintiff Doe.  Doe was held in custody for approximately 27 hours without

ever being charged or brought before a neutral judicial officer for a probable cause hearing.

Doe claimed that his detention violated his fourth amendment right to be free from unreasonable

seizure.  But relying on the Supreme Court's holding in *Riverside* that "a jurisdiction that

provides judicial determinations of probable cause within 48 hours of arrest will, as a general

matter, comply with the promptness requirements of *Gerstein,*" the *Doe* court concluded that

because the Cleveland police released Doe within 48 hours of arrest, Doe's fourth amendment

rights were not violated.  *Doe,* 788 F. Supp. at 982-983.

However, *Riverside* does not hold that detention of up to 48 hours is *per se* reasonable:

> This is not to say that the probable cause determination in a particular case passes
> muster simply because it was provided within 48 hours.  Such a hearing may
> nonetheless violate *Gerstein* if the arrested individual can prove that his or her
> probable cause determination was delayed unreasonably.  Examples of
> unreasonable delay are delays for the purpose of gathering additional evidence to
> justify the arrest, a delay motivated by ill will against the arrested individual, or
> delay for delay's sake.

*Riverside*, 500 U.S. at 56.

The Court concludes for the reasons discussed below that there are material facts in

dispute as to the reasonableness of Wheeler's detention.  The Court already concluded, *supra*,

that there are material facts in dispute as to whether Officer Lane had probable cause to arrest

Wheeler in the first place.  Further, no complaint was ever filed against Wheeler that would have

resulted in taking, or justified producing, Wheeler before a judicial office for a probable cause

hearing.  Lastly, there are material facts at issue as to whether the City of Cleveland had a

24

(1:08 CV 1117)

procedure or policy regarding the charge and release of misdemeanor arrestees.

Wheeler was taken to the Cleveland Police Department and detained there for approximately 35 hours, even though no complaint charging him with a crime had been or was subsequently filed.  The defendants have contended that Erica Anderson completed a criminal complaint on April 2, 2007 and handed the same to Officers Ellis and Lane, but that in some fashion, the executed complaint had been lost.[15]  The Court requested that the defendants file a copy of the complaint form that the defendants contend Erica Anderson completed at the time of the warrantless arrest of Wheeler.  The form has now been produced and is attached hereto as Appendix III.

However, the form does not constitute, contrary to the position of the defendant City of Cleveland, a document that constitutes a complaint in compliance with Ohio law.

Specifically, Rule 3 of the Ohio Rules of Criminal Procedure provides:

> The complaint is a written statement of the essential facts constituting the offense charged.  It shall also state the numerical designation of the applicable statute or ordinance.  <u>It shall be made upon oath before any person authorized by law to administer oaths.</u>  (Emphasis added)

The misdemeanor complaint statement (Appendix III) and upon which the defendants rely, even if it had been completed and delivered to the Cleveland Police Department, would not have been under oath and would not have constituted a complaint requiring subsequent judicial action.

---

[15]If in fact the defendants had been able to produce a signed misdemeanor complaint statement signed by Erica Anderson, such discovery would have been of no evidentiary consequence.

25

(1:08 CV 1117)

In this case, no criminal charges were lodged against Wheeler by way of complaint or otherwise.  During the oral argument hearing conducted by the Court, the Court understood the defendants to be declaring that Officers Ellis and Lane filed some sort of document with the Cleveland Police Department when they delivered Wheeler to the police department, but

without filing a criminal complaint against Wheeler.  Against that background, the Court asked for copies of any incident reports filed by either defendant Officers Lane or Ellis when they delivered Wheeler to the Cleveland Police Department for jailing following his warrantless arrest.  In response, counsel for the defendants have filed in Docket No. 47 the unsigned Incident Report prepared apparently by either defendant Officer Lane or Ellis and the same is attached hereto as Appendix IV.  The Court notes that the Incident Report makes reference that the victim "completed a misdemeanor statement form."  The Incident Report thus conclusively demonstrates that no criminal complaint consistent with the provisions of Rule 3 of the Ohio Rules of Criminal Procedure was filed at any time to support the continued detention of the plaintiff Wheeler.

For reasons best known to Officers Ellis and Lane, neither filed a complaint despite the mandate of Ohio Criminal Rule 4(E)(2).  Although they offered deposition testimony that Erica Anderson signed a complaint, there is no factual support for that proposition.[16]

The Court rejects the position of the City of Cleveland that it is entitled to engage in a

---

[16]As has subsequently developed, the document that defendant Officers Lane and Ellis indicated that Erica Anderson signed was not a complaint in any sense of the word in the context of Rule 3 of the Ohio Rules of Criminal Procedure.

26

(1:08 CV 1117)

procedure by which any citizen may be subjected to a warrantless arrest and subsequently

detained in custody for up to 48 hours without charge, but that citizen has no judicial remedy

available.  The Supreme Court in *Riverside* did not hold that a detention less than 48 hours is

*per se* constitutional, but held that even a probable cause determination provided within 48 hours

may violate *Gerstein* if the delay is unreasonable.  *Riverside*, 500 U.S. at 56.

Viewing all the facts in a light most favorable to the plaintiff, the Court concludes that

there are material facts in dispute as to the reasonableness of Wheeler's detention when he was

subjected to a warrantless arrest where the probable cause for the arrest itself is in question, and

no criminal complaint was ever filed by either Officers Lane or Ellis or by Erica Anderson, the

mother of the alleged victim.  As a consequence, in the context of the teachings of *Riverside*, the

Court denies the motion of the defendant City of Cleveland for summary judgment on the

plaintiff's claim for unlawful detention.

D.      Counts VI, VII and VIII (State Law Claims for Assault, Negligence and Intentional
        Infliction of Emotional Distress)

Defendants argue that they are immune from plaintiff's state law claims for assault,

negligence, and intentional infliction of emotional distress pursuant to Ohio Revised Code

Chapter 2744.  The statute provides for an exception to immunity when the acts or omissions

occurred with a malicious purpose, in bad faith, or in a wanton or reckless manner.

The Court has already concluded that there are genuine issues of material fact as to

whether Officers Lane and Ellis utilized excessive force.  After consideration of the evidence

before the Court, and consideration of the supplemental brief filed in support of the claims set

forth in Counts VII and VIII in plaintiff's second amended complaint, the Court finds that the

27

(1:08 CV 1117)

issue of whether the force used by Officers Lane and Ellis occurred with a malicious purpose, in bad faith, or in a wanton or reckless manner, is in dispute and a question for the jury.  The Court finds no basis for any claim regarding ratification of the defendant officers' conduct by the City of Cleveland.  Accordingly, defendants' motion for summary judgment on Counts VI, VII and VIII of plaintiff's second amended complaint is denied.

## IV.  CONCLUSION

For the reasons set forth, the Court grants the defendant Officer Lane's motion to dismiss Count I on the basis of qualified immunity with respect to the warrantless arrest, and grants the defendant Officer Ellis' motion for summary judgment as to Count 1 with respect to the warrantless arrest.

The motion of defendant Officers Ellis and Lane to dismiss Counts I and II with respect to the excessive force claims brought by the plaintiff on the basis of qualified immunity is denied, and the motion of defendant Officers Ellis and Lane for summary judgment on the excessive force claims is denied.

The motion of the City of Cleveland and Officers Ellis and Lane for summary judgment on the plaintiff's claim advanced in Count III for the denial of medical care is granted.

The defendant City of Cleveland's motions with respect to the plaintiff's *Monell* claims as set forth in Count IV are granted on the failure to train and failure to supervise claims, but denied as to the plaintiff's Count V *Monell* claim alleging unreasonable detention.

The defendant Officers Ellis and Lane's motion for summary judgment on the plaintiff's pendent state action for assault (Count VI) is denied.

28

(1:08 CV 1117)


The motion of the defendant police Officers Ellis and Lane for summary judgment as to Count VII, alleging a state pendent action under O.R.C. § 2744.03(A)(6), is denied.

The defendant police Officers Ellis and Lane's motion for summary judgment as to Count VIII, alleging a state pendent action for intentional infliction of emotional distress, is denied.

The Court will conduct a status conference with counsel on August 27, 2009 at 12:00 noon for the purpose of scheduling this case for trial.

IT IS SO ORDERED.


  August 3, 2009                                    /s/ David D. Dowd, Jr.
Date                                              David D. Dowd, Jr.
                                                  U.S. District Judge

29